## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) PATRICE GREEN, as Special Administratrix of the Estate of MONTOYA HOLMES, deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 25-cv-00412-CDL |
| (1) TURN KEY HEALTH CLINICS, LLC, | ) | Jury Trial Demanded |
| (2) VIC REGALADO, in his official capacity, | ) | |
| (3) ANGELIA LEMONS, LPN, | ) | Attorney Lien Claimed |
| (4) TYLER VONHOLT, LPN, | ) | |
| (5) CRYSTAL WHISENHUNT, LPN | ) | |
| Defendants. | ) ) | |

## COMPLAINT

**COMES NOW**, Patrice Green, ("Plaintiff"), as the Special Administratrix of the Estate of

Montoya Holmes ("Ms. Holmes"), deceased, and for her causes of action against the above-named

Defendants, alleges and states the following:

## PARTIES, JURISDICTION AND VENUE

1.    Plaintiff was, at the pertinent times underlying this Complaint, a resident of Tulsa County,

Oklahoma. Plaintiff is the Special Administratrix of the Estate of Montoya Holmes, deceased. The

causes of action in this matter are based on violations of Ms. Holmes's rights under the Fourteenth

Amendment to the United States Constitution.

2.    Defendant Turn Key Health Clinics, LLC ("Turn Key") is an Oklahoma limited liability

company doing business in Tulsa County, Oklahoma.  Turn Key is a private correctional health care

company that contracts with counties, including, during the pertinent timeframe, Tulsa County, to

provide medical professional staffing, supervision and care in county jails. Turn Key was at all times

relevant hereto responsible, in part, for providing medical services, supervision and medication to

Ms. Holmes while she was in the custody of the Tulsa County Sheriff's Office ("TCSO"). Turn Key

was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Tulsa County Jail, and for training and supervising its employees. Turn Key was, at all times relevant hereto, endowed by Tulsa County with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations.

3.    Defendant Vic Regalado ("Sheriff Regalado" or "Defendant Regalado") is the Sheriff of Tulsa County, Oklahoma, residing in Tulsa County, Oklahoma and acting under color of State law. Sheriff Regalado is sued purely in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.,* 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing Sheriff Regalado in his official capacity, Plaintiff has brought suit against the County/TCSO. The Tulsa County Sheriff is the "Tulsa County official responsible for promulgating and enforcing policies for the [Jail], providing medical care to inmates and detainees, and operating the jail on a daily basis." *Wirtz v. Regalado,* No. 18-CV-0599-GKF-FHM, 2020 WL 1016445, at *6 (N.D. Okla. Mar. 2, 2020) (citing See 19 Okla. Stat. § 513; *Estate of Crowell ex rel. Boen v. Bd. of Cty. Comm'rs of Cleveland Cty.,* 237 P.3d 134, 142 (Okla. 2010)).

4.    Defendant Angelia Lemons, LPN ("Nurse Lemons") was, at all times relevant hereto, an employee and/or agent of Turn Key and the County/TCSO, who was, in part, responsible for overseeing Ms. Holmes's health and well-being, and assuring that Ms. Holmes's medical needs were met, during the time she was in the custody of TCSO. At all times pertinent, Nurse Lemons was acting within the scope of her employment and under color of law. Nurse Lemons is being sued in her individual capacity.

2

5.     Defendant Tyler Vonholt, LPN ("Nurse Vonholt") was, at all times relevant hereto, an employee and/or agent of Turn Key and the County/TCSO, who was, in part, responsible for overseeing Ms. Holmes's health and well-being, and assuring that Ms. Holmes's medical needs were met, during the time she was in the custody of TCSO. At all times pertinent, Nurse Vonholt was acting within the scope of his employment and under color of law. Nurse Vonholt is being sued in his individual capacity.

6.     Defendant Crystal Whisenhunt, LPN ("Nurse Whisenhunt") was, at all times relevant hereto, an employee and/or agent of Turn Key and the County/TCSO, who was, in part, responsible for overseeing Ms. Holmes's health and well-being, and assuring that Ms. Holmes's medical needs were met, during the time she was in the custody of TCSO. At all times pertinent, Nurse Whisenhunt was acting within the scope of her employment and under color of law. Nurse Whisenhunt is being sued in her individual capacity.

7.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

8.     The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

9.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

10.     Paragraphs 1-9 are incorporated herein by reference.

3

**A. Facts Specific to Ms. Holmes**

11.    Ms. Holmes was booked into the Tulsa County Jail ("Jail") on or around August 10, 2023.

12.    Ms. Holmes suffered from pre-existing health conditions, including asthma and anxiety, both of which were disclosed to TCSO detention staff and Turn Key medical staff at the time of her intake.

13.    At all pertinent times, Ms. Holmes was a pre-trial detainee.

14.    Nurse Lemons,  a Licensed Practical Nurse ("LPN"), conducted the medical intake screening of Ms. Holmes, the morning of August 10, 2023. During intake, Nurse Lemons was informed that Ms. Holmes suffered from asthma and anxiety, that Ms. Holmes was on medications for her health conditions, and that she had been treated at the emergency room for an ***asthma attack just one (1) day prior*** to her being booked into the Tulsa County Jail.

15.    Upon information and belief, Ms. Holmes specifically told Nurse Lemons that she had been to the St. John Emergency Room on August 9, 2023 due to abnormal breathing, including wheezing and increased difficulty breathing over the previous week. Ms. Holmes also reported to St. John providers, on August 9, that she had a headache and congestion. Ms. Holmes notified Nurse Lemons that that -- in addition to her normal asthma medications -- St. John providers prescribed a steroid, prednisone, to control her flaring asthma symptoms. She was to take the prednisone daily for 12 days due to her increasingly serious asthma symptoms.

16.    Upon information and belief, Ms. Holmes additionally reported that she received a shot every two weeks for her asthma.

17.    Ms. Holmes's medical history and prescriptions were entered into Turn Key's records but they were not properly acted upon.

18.    Ms. Holmes signed a release of information form allowing Turn Key to obtain her health and prescription records from Walgreen Pharmacy. Turn Key learned that Ms. Holmes was

prescribed numerous medications to treat her severe asthma which were required to be given at specific times or during an acute asthma attack. Turn Key health providers entered *some of that* information into their Medication Administration Record but did not administer the medications when they were medically necessary as detailed in the prescriptions. Importantly, a Turn Key provider, upon information and belief, Nurse Lemons, failed to enter Ms. Holmes's prednisone prescription – which had been sent to Walgreens by St. John on August 9, 2023 – into their MAR. *As a result, Ms. Holmes never received her prednisone while at the Jail.* Additionally, Nurse Lemons nor any other Turn Key provider sent a request to St. John for Ms. Holmes' August 9, 2023 ER records.

19.    During intake, Nurse Lemons learned that Ms. Holmes was prescribed one milligram of Xanax three times daily to treat her diagnosed anxiety condition and help control her asthma. However, this medication was never given, but instead Ms. Holmes's doctor was overruled by a Turn Key's LPN following a **Turn Key Flowsheet**. Subsequently, Ms. Holmes was never given her prescription, and she was instead placed on a ten-day detox/withdrawal monitoring program.

20.    During the intake process there were several errors made, including failing to enroll Ms. Holmes in a chronic disease program as detailed in Jail procedures. TCSO/Turn Key policy mandates that inmates like Ms. Holmes who have serious, chronic medical conditions like asthma, are to be put on a chronic disease protocol. This protocol requires medical providers at the Jail to more closely monitor inmates like Ms. Holmes.

21.    Despite Turn Key's own records reflecting the fact that Ms. Holmes required several prophylactic asthma medications once, twice, three, or four times a day, during her day and a half long stay at Tulsa County Jail, she did not receive the medications her condition requires.

22.    On the evening of August 10, 2023, Ms. Holmes spoke to Nurse Whisenhunt, an **LPN**, to request Ipratropium Bromide (A bronchodilator used to treat the symptoms of asthma) so she could

5

continue her regular medication schedule. Even though the Mayo Clinic recommends that if a dose is missed that the medication be given as soon as possible, Nurse Whisenhunt failed to give Ms. Holmes her Ipratropium Bromide. Indeed, the medication was ultimately *never* given to Ms. Holmes.[1]

23.    Ms. Holmes was deprived of access to her prescribed rescue inhaler despite Oklahoma law specifically allowing prescribed inhalers to be kept on the inmate while they are inside the jail. (*See* 57 OK Stat § 4.1).

24.    At approximately 9:05 p.m. on August 10, 2023, Nurse Vonholt, an LPN, assessed Ms. Holmes for withdrawal from her anxiety medication.

25.    While Ms. Holmes was not suffering from withdrawal symptoms, she was obviously suffering from severe symptoms related to her asthma, including shortness of breath, severe coughing, and wheezing.

26.    Upon information and belief, Ms. Holmes asked Nurse Vonholt for her asthma medications, but Nurse Vonholt, in deliberate indifference to Ms. Holmes obviously serious medical needs, ignored her requests.

27.    For all of August 11, 2023, Ms. Holmes received *zero asthma medications*, neither her maintenance medications nor her emergency relief medications, despite her begging multiple members of the Jail staff and Turn Key staff for her life-sustaining medications.

28.    A fellow inmate witnessed Ms. Holmes repeatedly pleading with both detention staff and Turn Key staff for her inhaler throughout her confinement.

29.    Upon information and belief, on August 11, 2023, Ms. Holmes suffered a fatal asthma attack inside the Tulsa County Jail.

---

[1] *See* Mayo Clinic, *Ipratropium (inhalation route)*, *https://www.mayoclinic.org/drugs-supplements/ipratropium-inhalation-route/description/drg-20067557*, last accessed 6/20/25

30.    At approximately 3:30 P.M. on August 11, 2023, Ms. Holmes was found unresponsive, with blood in her airway[2], and in cardiac arrest by jail detention officers.

31.    Upon EMS's arrival at the Jail, Turn Key and detention staff failed to inform paramedics of Ms. Holmes's history of asthma.

32.    Ms. Holmes was transported via ambulance to OSU Medical Center Emergency Room where she was later pronounced dead at age 40.

**B.  The Jail's Unconstitutional Health Care Delivery System / Policies and Customs**

33.    The deliberate indifference to Ms. Holmes's serious medical needs and her safety, as summarized *supra*, was in furtherance of and consistent with: a) policies, customs, and/or practices which TCSO promulgated, created, implemented or possessed responsibility for the continued operation of; and b) policies, customs, and/or practices which Turn Key developed and/or had responsibility for implementing.

34.    To the extent that no single officer or professional violated Ms. Holmes's constitutional rights, Tulsa County/Sheriff and Turn Key are still liable under a theory of a systemic failure of policies and procedures as described below. There were such gross deficiencies in medical procedures, staffing and facilities and procedures that Ms. Holmes was effectively denied constitutional conditions of confinement.

35.    There are longstanding, systemic deficiencies in the medical and mental health care provided to inmates at the Tulsa County Jail. Both Sheriff Regalado and Former Sheriff Stanley Glanz have long known of these systemic deficiencies and the substantial risks they pose to inmates like Plaintiff but failed to take reasonable steps to alleviate those deficiencies and risks.

---

[2] Upon information and belief, Ms. Holmes had been coughing so severely during her time at the Jail, she began coughing up blood due to her asthma.

36.     For instance, in 2007, the NCCHC, a corrections health accreditation body, conducted an on-site audit of the Jail's health services program. At the conclusion of the audit, NCCHC auditors reported serious and systemic deficiencies in the care provided to inmates, including failure to perform mental health screenings, failure to fully complete mental health treatment plans, failure to triage sick calls, failure to conduct quality assurance studies, and failure to address health care needs in a timely manner. NCCHC made these findings of deficient care despite Former Sheriff Glanz's/TCSO's efforts to defraud the auditors by concealing information and falsifying medical records and charts.

37.     Former Sheriff Glanz failed to change or improve any health care policies or practices in response to NCCHC's findings.

38.     In August of 2009, the American Correctional Association ("ACA") conducted a "mock audit" of the Jail.  The ACA's mock audit revealed that the Jail was non-compliant with "mandatory health standards" and "substantial changes" were suggested.  Based on these identified and known "deficiencies" in the health delivery system at the Jail, the Jail Administrator sought input and recommendations from Elizabeth Gondles, Ph.D. ("Dr. Gondles").  Dr. Gondles was associated with the ACA as its medical director or medical liaison. After reviewing pertinent documents, touring the Jail and interviewing medical and correctional personnel, on October 9, 2009, Dr. Gondles generated a Report, entitled "Health Care Delivery Technical Assistance" (hereinafter, "Gondles Report").  The Gondles Report was provided to the Jail Administrator, Michelle Robinette.  As part of her Report, Dr. Gondles identified numerous "issues" with the Jail's health care system, as implemented by the Jail's former medical provider, CHC.  After receiving the Gondles Report, Chief Robinette held a conference -- to discuss the Report -- with the Undersheriff, Administrative Captain and CHC/CHM.

39.     Among the issues identified by Dr. Gondles, as outlined in her Report, were: (a) understaffing of medical personnel due to CHM misreporting the average daily inmate population; (b) deficiencies in "doctor/PA coverage"; (c) a lack of health services oversight and supervision; (d) failure to provide new health staff with formal training; (e) delays in inmates receiving necessary medication; (g) nurses failing to document the delivery of health services; (h) systemic nursing shortages; (h) failure to provide timely health appraisals to inmates; and (i) 313 health-related grievances within the past 12 months.  Dr. Gondles concluded that "[m]any of the health service delivery issues outlined in this report are a result of the lack of understanding of correctional healthcare issues by jail administration and contract oversight and monitoring of the private provider."  Based on her findings, Dr. Gondles "strongly suggest[ed] that the Jail Administrator establish a central Office Bureau of Health Services" to be staffed by a TCSO-employed Health Services Director ("HSD").  According to Dr. Gondles, without such an HSD in place, TCSO could not properly monitor the competency of the Jail's health staff or the adequacy of the health care delivery system.

40.     Nonetheless, TCSO leadership chose not to follow Dr. Gondles' recommendations. TCSO did not establish a central Office Bureau of Health Services nor hire the "HSD" as recommended.

41.     On October 28, 2010, Assistant District Attorney Andrea Wyrick wrote an email to Josh Turley, TCSO's "Risk Manager".  In the email, Ms. Wyrick voiced concerns about whether the Jail's medical provider, CHMO, a subsidiary of CHC, was complying with its contract.  Ms. Wyrick further made an ominous prognosis: "This is very serious, especially in light of the three cases we have now - what else will be coming? It is one thing to say we have a contract ... to cover medical services, it is another issue to ignore any and all signs we receive of possible [medical] issues or

violations of our agreement with [CHC] for [health] services in the jail.  The bottom line is, the Sheriff is statutorily obligated to provide medical services."

42.     NCCHC conducted a second audit of the Jail's health services program in 2010. After the audit was completed, the NCCHC placed the Tulsa County Jail on probation.

43.     NCCHC once again found numerous serious deficiencies with the health services program. As part of the final 2010 Report, NCCHC found, inter alia, as follows: "The [Quality Assurance] multidisciplinary committee does not identify problems, implement and monitor corrective action, nor study its effectiveness"; "There have been several inmate deaths in the past year"; The clinical mortality reviews were poorly performed"; "The responsible physician does not document his review of the RN's health assessments"; "the responsible physician does not conduct clinical chart reviews to determine if clinically appropriate care is ordered and implemented by attending health staff"; "diagnostic tests and specialty consultations are not completed in a timely manner and are not ordered by the physician"; "if changes in treatment are indicated, the changes are not implemented"; "When a patient returns from an emergency room, the physician does not see the patient, does not review the ER discharge orders, and does not issue follow-up orders as clinically needed"; and "potentially suicidal inmates [are not] checked irregularly, not to exceed 15 minutes between checks. Training for custody staff has been limited. Follow up with the suicidal inmate has been poor."

44.     Former Sheriff Glanz only read the first two or three pages of the 2010 NCCHC Report. Former Sheriff Glanz is unaware of any policies or practices changing at the Jail in response to 2010 NCCHC Report.

45.     Over a period of many years, Tammy Harrington, R.N., former Director of Nursing at the Jail, observed and documented many concerning deficiencies in the delivery of health care services to inmates. The deficiencies observed and documented by Director Harrington include:

10

chronic failure to triage inmates' requests for medical and mental health assistance; a chronic lack of supervision of clinical staff; and repeated failures of medical staff to alleviate known and significant deficiencies in the health services program at the Jail.

46.     On September 29, 2011, the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") reported its findings in connection with an audit of the Jail's medical system - pertaining to U.S. Immigration and Customs Enforcement ("ICE") detainees -- as follows: "CRCL found a prevailing attitude among clinic staff of indifference"; "Nurses are undertrained. Not documenting or evaluating patients properly."; "Found one case clearly demonstrates a lack of training, perforated appendix due to lack of training and supervision"; "Found two detainees with clear mental/medical problems that have not seen a doctor."; "[Detainee] has not received his medication despite the fact that detainee stated was on meds at intake"; "TCSO medical clinic is using a homegrown system of records that 'fails to utilize what we have learned in the past 20 years".

47.     Director Harrington did not observe any meaningful changes in health care policies or practices at the Jail after the ICE-CRCL Report was issued.

48.     On the contrary, less than 30 days later the ICE-CRCL Report was issued, on October 27, 2011 another inmate, Elliott Earl Williams, died at the Jail as a result of truly inhumane treatment and reckless medical neglect which defies any standard of human decency.  A federal jury has since entered a verdict holding Sheriff Regalado liable in his official capacity for the unconstitutional treatment of Mr. Williams.

49.     In the wake of the Williams death, which was fully investigated by TCSO, Former Sheriff Glanz made no meaningful improvements to the medical system. This is evidenced by the fact that yet another inmate, Gregory Brown, died due to grossly deficient care just months after Mr. Williams.

11

50.     On November 18, 2011, AMS-Roemer, the Jail's own retained medical auditor, issued its Report to Former Sheriff Glanz finding multiple deficiencies with the Jail's medical delivery system, including "[documented] deviations [from protocols which] increase the potential for preventable morbidity and mortality."  AMS-Roemer specifically commented on no fewer than six (6) inmate deaths, finding deficiencies in the care provided to each.

51.     It is clear that Former Sheriff Glanz did little, if anything, to address the systemic problems identified in the November 2011 AMS-Roemer Report, as AMS-Roemer continued to find serious deficiencies in the delivery of care at the Jail. For instance, as part of a 2012 Corrective Action Review, AMS-Roemer found "[d]elays for medical staff and providers to get access to inmates," "[n]o sense of urgency attitude to see patients, or have patients seen by providers," failure to follow NCCHC guidelines "to get patients to providers," and "[n]ot enough training or supervision of nursing staff."

52.     In November 2013, BOCC/TCSO/Former Sheriff Glanz retained Armor Correctional Health Services, Inc. ("Armor") as its private medical provider. However, this step did not alleviate the constitutional deficiencies with the medical system. Medical staff was still undertrained and inadequately supervised and inmates were still denied timely and sufficient medical attention. Bad medical and mental health outcomes persisted due to inadequate supervision and training of medical staff, and due to the contractual relationship between BOCC/TCSO/Former Sheriff Glanz and ARMOR (which provided financial disincentives for the transfer of inmates in need of care from an outside facility).

53.     In February 2015 an auditor/nurse hired by Tulsa County/TCSO, Angela Mariani, issued a report focused on widespread failures by ARMOR to abide by its $5 million annual contract with the County. Mariani also wrote three (3) memos notifying TCSO that ARMOR failed to staff various medical positions in the Jail and recommending that the county withhold more than $35,000 in

payments. Her report shows that Jail medical staff often failed to respond to inmates' medical needs and that ARMOR failed to employ enough nurses and left top administrative positions unfilled for months. Meanwhile, medical staff did not report serious incidents including inmates receiving the wrong medication and a staff member showing up "under the influence."

54.     In approximately December 2016, the County/Sheriff Regalado retained Turn Key as the Jail's medical contractor. Turn Key's CEO, Flint Junod, was Armor's Vice President of the Jail's region during Armor's tenure as the Jail's private medical provider and he was aware of deficiencies in the medical care provided at the Jail prior to and at the time Turn Key was retained.

55.     The County/Sheriff Regalado replaced Armor with Turn Key in large part because Angela Mariana had concluded, in October 2016, that "[s]ince Armor has been [the medical provider at the Jail] there have been significant issues with no improvement. I am concerned that we have seen the best they can offer because these issues have been addressed and no improvements made."

56.     For a time in recent years, Defendant Turn Key was the largest private medical care provider to county jails in the state. Turn Key used its political connections to obtain contracts in a number of counties, including Tulsa County, Muskogee County, Garfield County, and Creek County. Turn Key now has contracts with county jails in over ten (10) states and with hundreds of counties.

57.     Turn Key has demonstrated, over a period of years, that its medical delivery system and "plan" is dangerously deficient. At least by the time of Ms. Holmes's death, the County/TCSO knew, or should have known, that Turn Key's grossly deficient system and "plan" posed excessive risks to the health and safety of inmates, like Ms. Holmes, who suffer from serious and complex medical conditions.

58.     To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

13

59.     There are no provisions in Turn Key's contract creating or establishing any mandatory minimum expenditure for the provision of Healthcare Services. Turn Key's contract incentivizes cost-cutting measures in the delivery of medical and mental health care service at the Jail to benefit Turn Key's investors in a manner that deprives inmates at the Jail from receiving adequate medical care.

60.     Under the Contract, Turn Key is responsible to pay the costs of all pharmaceuticals at the Jail up to a certain amount. If the annual pharmaceutical costs exceed this limit, TCSO/Tulsa County is responsible for the excess costs.

61.     Similarly, Turn Key was responsible to pay the costs for all off-site medical services and hospitalizations up to a certain amount, and TCSO/Tulsa County was responsible for any excess costs of inmate hospitalizations and off-site medical care.

62.     The Contract provided that Turn Key will arrange and bear the cost of hospitalization of inmates who – in the opinion of the Turn Key treating physician or medical director, require hospitalization – up to the agreed-upon limit.

63.     These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, at the Jail and to avoid off-site medical costs.

64.     These financial incentives create risks to the health and safety of inmates like Ms. Holmes who have complex and serious medical conditions, such as asthma.

65.     In bidding for contracts with other counties, Turn Key boasts of their ability to save costs, specifically citing Tulsa County. Indeed, in bidding for other counties, Turn Key asserts:

> According to statistics maintained by the facility, *Tulsa County experienced a 77% reduction in monthly emergency room transfers and a 35% reduction in monthly hospital days* within the first few months of Turn Key replacing Armor's program. To further highlight our success, the *annual offsite expenditures have remained well below the established Aggregate CAP since we started our contract. This is an accomplishment that had not been realized for at least 4 years prior to Turn Key taking over the program!*

14

In addition to the cost savings associated with fewer hospital claims, Tulsa County experienced additional cost savings in the form of the reduced need for offsite security personnel. On average, TCSO was able to reallocate an average of 585 man-hours per month to other security functions as opposed to ER and hospitalization security duty. Even with a conservative estimate, *we believe our program allowed for an annual reduction of more than $175,000 of excessive offsite security pay.*

66.    Turn Key provides insufficient guidance and supervision to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical needs, including chronic asthma conditions, anxiety and acute asthma attacks.

67.    Specifically, Turn Key has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions.

68.    These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious medical or mental health needs, including chronic asthma conditions and acute asthma attacks.

69.    Like the Jail's previous medical providers, Turn Key has an established policy, practice, and/or custom of allowing undertrained and under-supervised LPNs to provide medical assessments, monitoring and care well outside the scope of their licensure and practice.[3]

70.    Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

71.    Decisions related to the assessment and treatment of Plaintiff were largely made by LPNs,

---

[3]    "Licensed practical nursing" means "the practice of nursing *under the supervision or direction of a registered nurse, licensed physician* or dentist." 59 Okla. Stat. § 567.3a(4) (emphasis added). An LPN cannot diagnose a medical condition. An LPN cannot prescribe medication. An LPN cannot even medically assess a patient without the guidance or supervision of an RN or physician.

without clinical supervision, who failed to refer Ms. Holmes to a physician.

72.     Indeed, Ms. Holmes was never assessed by a physician at the Jail (or even a mid-level provider, such as an APRN or physician's assistant) and *her own physician's orders for anxiety medication were overridden by a Turn Key LPN following a Turn Key flow chart* despite the known link between asthma attacks and anxiety.[4]

73.     Turn Key's corporate policies, practices and customs as described *supra*, have resulted in deaths or negative medical outcomes in countless cases in both Tulsa County and across the country, in addition to Ms. Holmes's.

74.     These other cases bear numerous similarities. Indeed, in most of the deaths and negative outcomes at jails in which Turn Key is the medical provider, there exist some variation of the following circumstances: 1) Turn Key employees ignore or fail to address the symptoms and concerns reported to them; 2) non-medical professionals, including jailers or other inmates, pleading with Turn Key employees to further assess or treat inmates; 3) inmates begging Turn Key employees to take them to the hospital; 4) inmates complaining of symptoms of a serious medical condition for hours; 5) inmates manifesting visible symptoms of a serious medical condition for hours; 6) Turn Key employees being aware of inmates' medical histories and ignoring symptoms related to those histories; 7) Turn Key employees failing to administer inmates' prescribed medications to them as directed or at all; 8) Turn Key employees delaying in getting inmates assessed by a physician, leading to their suffering and deaths; and/or 9) Turn Key employees delaying in hospitalizing inmates, leading to their suffering and deaths.

75.     For instance, in November 2014, while detained at the Cleveland County Jail, Robert Allen Autry developed a sinus infection. Both he and his mother informed Turn Key medical staff that a

---

[4]     See Asthma and Lung UK, *Your lung condition and anxiety*, *https://www.asthmaandlung.org.uk/living-with/mental-health/anxiety*, last accessed 6/23/2025

traumatic brain injury he suffered as a teenager made him particularly susceptible to sinus infections causing life threatening brain infections. Mr. Autry and his mother repeatedly asked medical staff to provide antibiotics, but none were provided.

76.     Approximately two weeks after she initially contacted medical staff about her son's condition and need for care, Turn Key staff called Mr. Autry's mother asking her to provide written consent for Mr. Autry to receive emergency surgery.

77.     He had been found unconscious in his cell and had been transported to the hospital. Later the same day, Mr. Autry was diagnosed with "a serious bacterial infection in his brain as a result of an untreated sinus infection." Mr. Autry underwent emergency brain surgery and subsequently a serious of other operations and procedures to place a feeding tube, insert a tracheal tube, and replace a cranial monitoring probe.

78.     Eventually, the treating physician determined Mr. Autry "was totally incapacitated from a brain injury resulting from a brain abscess and subdural empyema" and "would likely never return to an independent state."

79.     In June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair. Mr. Huff's estate reached a settlement with Garfield County for $12,500,000 dollars and a confidential settlement with Turn Key. Upon information and belief, Turn Key employees were criminally charged in connection with their treatment of Mr. Huff.

80.     Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016. Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer

spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of the jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself or use the bathroom on his own. He lay in his own urine and feces because the jail staff told Smith he was faking paralysis and refused to help him.

81.    In November of 2016, Muskogee County Jail and Turn Key staff disregarded, for days, the complaints and medical history of inmate James Douglas Buchanan. As noted by Clinton Baird, M.D., a spinal surgeon,

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history... [H]e was involved in being struck by a car while riding bicycle several weeks ago. ... *He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he likely developed the beginnings of cervical epidural abscess infection* in result of his critical illness [and] hospitalization, but then *while in jail, he deteriorated significantly and his clinical deterioration went unrecognized and untreated until he was nearly completely quadriplegic.*

(emphasis added).

82.    On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017. Mr. Lee's estate brought claims, pursuant to 42 U.S.C. § 1983, against Sheriff Regalado, in his

18

official capacity, Turn Key, and employees of Turn Key. Mr. Lee's estate ultimately reached a confidential settlement in 2022. *See Lee v. Turn Key Health Clinics, LLC, et al.,* Case No. 19-CV-318-GKF-JFJ (N.D. Okla.).

83.    Like Ms. Holmes, a physician never once saw Mr. Lee for a week before his death, despite the fact that his symptoms and conditions, including hypertension, bipolar disorder, and hallucinations, continued to deteriorate.

84.    In January 2018, Marconia Kessee died of drug toxicity in the Cleveland County Jail after Turn Key wholly failed to take any actions – including performing a medical intake evaluation – in response to profuse sweating, inability to walk, incoherent speech, and seizure-like convulsions of Mr. Kessee and instead put him in a cell where he died within hours. Cleveland County Jail jailers were aware of the same symptoms and performed wholly inadequate, less than one-second-long sight checks of Mr. Kessee throughout the last hours of his life. Turn Key staff did not even perform a single sight check of Mr. Kessee during the time he lay dying, until he was found completely unresponsive.

85.    In November 2018, Misty Bailey, a pretrial detainee at the Ottawa County Jail, began to suffer from severe chest pain and elevated heart rate. She eventually started vomiting, could not hold down any food or medications, and also began experiencing lower back pain and severe pain when urinating. Despite being informed of these symptoms, Turn Key medical staff refused to assess Ms. Bailey or send her to a hospital. For two days Ms. Bailey continued to deteriorate, eventually experiencing a fever of 103 degrees and a seizure, at which point detention staff informed Ms. Bailey she would be taken to a hospital only if she agreed to be released on her own recognizance and assume financial responsibility for her medical care.

86.    At the hospital, Ms. Bailey was diagnosed with a bacterial UTI infection that had progressed to her kidney. In its Order denying Turn Key's motion to dismiss, this Court emphasized that *Monell*

liability is adequately alleged at the pleading stage where a plaintiff points to comparable instances at other facilities operated by Turn Key: "Plaintiff cites numerous instances at other prison medical facilities operated by Turn Key in which medical care was inadequate or denied altogether, and she alleges that the poor medical care is the result of a custom or policy of Turn Key to cut costs and prioritize financial gain over the delivery of constitutionally adequate medical care. At the pleading stage, the Court finds that plaintiff's allegations are sufficient to support an inference that plaintiff was denied medical care for serious condition due to an official policy or custom, and Turn Key's motion to dismiss should be denied." *Bailey v. Turn Key Health Clinics, LLC*, No. 20- CV-0561-CVE-SH, 2021 U.S. Dist. LEXIS 177310, at *18-19 (N.D. Okla. Sep. 17, 2021). The case settled confidentially and a stipulation of dismissal was filed on December 10, 2021.

87.    On December 27, 2018, Michelle Ann Caddell was arrested and booked into the Tulsa County Jail. Throughout early July, Ms. Caddell made multiple requests for treatment related to hip and thigh pain. She was evaluated on July 14.

88.    On August 5, Ms. Caddell was evaluated by Dr. Gary Myers who ordered blood tests revealing Ms. Caddell had mild anemia.

89.    On August 10, Ms. Caddell again complained of vaginal discharge and blood clots a nurse then ordered more tests which showed an elevated white blood cell count and heavy E. Coli growth, associated with several virulence factors.

90.    Despite Ms. Caddell's serious symptoms (which at this point consisted of excessive vaginal bleeding, blood clots, hip pain, vaginal discharge, pain and difficulty with bowel movements, anemia, and an elevated white blood cell count) she was *given only Tylenol and her requests for medical treatment were written off* by Dr. Gary Myers as her "abusing the [sick call] system."

91.    On September 15, Ms. Caddell was seen by Nurse Suzanne who attempted to refer Ms. Caddell to an obstetrician but the Turn Key administrator unnecessarily delayed this referral until

September 27. Once seen by an obstetrician Ms. Caddell received a differential diagnosis of invasive cervical cancer which was confirmed by test results on October 6.

92.     Ms. Caddell did not receive treatment or see a doctor from October 6 until October 30. On October 30, Ms. Caddell was soaking through a pad from heavy bleeding every 20 minutes and began discharging tissue from her vagina. Eventually she was taken to a hospital

93.     At the hospital it was determined that Ms. Caddell had *at least* stage three cervical cancer and was given morphine for her extreme pain. Ms. Caddell was later released from custody so she could finally begin treatment for cancer. She died on August 16, 2020. The Tenth Circuit reversing an order to dismiss held it was plausible for Dr. Myers to be found liable for deliberate indifference based on a failure to treat theory and/or a gatekeeper theory. For the failure to treat theory the court held "Dr. Myers is not insulated from liability by providing some initial modicum of care and then proceeding to otherwise ignore all of Ms. Caddell's serious medical symptoms." *Lucas v. Turn Key Health Clinics, LLC* (10th Cir. 2023) 58 F.4th 1127 at 1142. For the gatekeeper theory the court held that a "provider" often simultaneously acts as a "gatekeeper" and a later referral by someone else does not erase the failure to act. *Id* at 1142-43.

94.     On September 6, 2019, Dunniven Phelps was booked in to the Tulsa County Jail.

95.     During the book-in process, on September 6 at approximately 7:35 p.m., Turn Key employee/agent Richard Dutra filled out an Intake Screening form. Pertinently, the Intake Screening form indicates that Mr. Phelps was being treated for hypertension (high blood pressure) at the time and had been prescribed medication by his physician to treat the condition. During the intake screening process, Mr. Dutra further documented that Mr. Phelps was diabetic and had previously been diagnosed with mental health conditions.

96.     During the medical intake process, Mr. Phelps complained that he had a severe headache, neck pain, and blurry vision, which are common symptoms of a stroke.

97.     Despite the fact that Mr. Phelps told Mr. Dutra about his current symptoms and history of hypertension, Mr. Dutra recommended that Mr. Phelps be placed in general population and that he did not need a referral for a continuity of care plan.

98.     Throughout the night of September 6, 2019, Mr. Phelps' symptoms significantly worsened, as he was obviously suffering from a stroke.

99.     By the morning of September 7, Mr. Phelps was experiencing severe weakness on the entire left side of his body, leaving him barely able to walk, as his left leg was almost completely numb.

100.    At approximately 9:37 a.m. on September 7, Turn Key Nurse Patty Buchanan "assessed" Mr. Phelps, who told her that he could hardly feel or move the left side of his body and his other symptoms, such as dizziness and blurred vision, were worsening. Nurse Buchanan recorded Mr. Phelps' blood pressure as 163/103, which the American Heart Association classifies as Stage 2 hypertension.

101.    Nurse Buchanan failed to inform a physician or even an RN or Nurse Practitioner about Mr. Phelps' alarming symptoms and worsening condition, in deliberate indifference to his serious medical needs.

102.    Further, while Nurse Buchanan allegedly counseled Mr. Phelps on the importance of taking his medications, there is no evidence that she, or anyone else at TCSO/Turn Key, *ever gave Mr. Phelps any medications during his time at the Jail.*

103.    On one occasion, when Mr. Phelps could not get off of the ground because he could not use his left leg or left arm, a DO threatened to "Taze" Mr. Phelps if he didn't get off the ground.

104.    Mercifully, an inmate who was an amputee let Mr. Phelps use his wheelchair so that he could try to get an actual medical assessment and treatment at the medical unit of the Jail.

105.    At approximately 2:19 p.m. on September 7, a DO finally agreed to wheel Mr. Phelps to the medical unit, where he was seen by Nurse Gann.

106.    Shockingly, Nurse Gann thought Mr. Phelps was faking his emergent condition. Jail surveillance video shows Mr. Phelps lying on the ground in the medical unit, unable to walk, stand, or effectively use his arms, while Nurse Gann drops a piece of paper onto his face, presumably because she thought Mr. Phelps would move out of the way if he was capable of moving. Nurse Gann and other Turn Key personnel left Mr. Phelps lying on the floor, helpless and in immeasurable pain.

107.    At 4:05 p.m. on September 7, Mr. Phelps was finally seen by Elizabeth Martin, Advanced Practical Registered Nurse ("APRN").

108.    APRN Martin noted that Plaintiff had a *"3 day history of evolving stroke like symptoms."* She also noted that Plaintiff's "speech [was] slurred" and that he had "left side facial droop" and weakness on his left side. By this time, Plaintiff's blood pressure was 183/114, which is considered a *hypertensive crisis that requires immediate consultation and assessment by a physician.*

109.    Mr. Phelps was finally sent to Hillcrest Medical Center at approximately 6:15 p.m. on September 7, 2019.

110.    Once at Hillcrest, Mr. Phelps was transferred to the Intensive Care Unit ("ICU") where physicians provided emergent, live-saving treatment.

111.    Unfortunately, the delay in treating Mr. Phelps, due to Turn Key and Jail staff's deliberate indifference, resulted in Mr. Phelps suffering permanent damage.

112.    Mr. Phelps is now permanently paralyzed on the entire left side of his body and will require significant medical treatment for the rest of his life.

113.    Mr. Phelps brought claims, pursuant to 42 U.S.C. § 1983, against Sheriff Regalado, in his official capacity, Turn Key, and employees of Turn Key. Mr. Phelps ultimately reached a confidential settlement in 2024. *See Phelps v. Buchanan, et al.,* Case No. 21-CV-365-GKF-JFJ (N.D. Okla.).

23

114.    From June to October 2019, Bryan Davenport, an inmate at the Cleveland County Jail, was denied adequate medical care by Turn Key personnel. Mr. Davenport informed Turn Key staff that he had hypertension and HIV, yet he was not seen by a physician, physician's assistant, or nurse practitioner for nearly a month after his arrival at the jail. Davenport provided Turn Key staff with the names of his providers, his need for HIV medications, and the names of those medications. When a Turn Key nurse finally saw Davenport, she told him that she did not want to start treatment pertaining to his HIV and left him without vital medications for several months. Turn Key also refused to treat Davenport under their "chronic care" protocol, instead requiring him to submit multiple sick calls just to attempt to get his medications so that Turn Key and Cleveland County could charge Davenport $15/visit.

115.    In October-November 2020, an inmate at the Cleveland County Jail slowly died of his known congestive heart failure as Turn Key and its employees ignored the obvious and severe worsening of his condition, including extreme edema and swelling, fluid leaking from his legs, urinary incontinence, and clear sings of infection. Turn Key staff failed to properly assess, evaluate, or treat the inmate and failed to refer him to a more highly trained provider or an outside medical provider.

116.    In July 2021, an inmate named Perish White died of COVID-19, which he contracted in the Creek County Jail.

117.    Mr. White began feeling ill on or about July 5, 2021, and reported his symptoms to Turn Key staff at the Creek County Jail.

118.    By July 8, 2021, at the latest, Mr. White began experiencing shortness of breath and coughing. On information and belief, Mr. White also stopped eating and was refusing meal trays. These drastic changes in Parish's condition, particularly in light of the ongoing COVID-19 pandemic, made it obvious, even to a layperson, that Perish needed emergent evaluation and treatment from a physician.

119. *From July 5 to July 16, 2021, Turn Key staff never once took Mr. White's vital signs,* despite his repeated complaints that he was seriously ill, his obvious symptoms, and the fact that COVID-19 was raging through the Creek County Jail.

120. On July 19, 2021, Mr. White was finally taken to OSU Medical Center in Tulsa for COVID-19 and respiratory failure. At the time, his oxygen saturation level was in the 70's. He was diagnosed with acute kidney failure. He was placed on life support, including a ventilator and dialysis.

121. Mr. White died on July 30, 2021.

122. On April 13, 2021, Christa Sullivan died at the Oklahoma County Jail ("OCJ"), which also uses Turn Key as its jail medical provider.

123. Ms. Sullivan had a history of severe mental illness, including depression, bipolar disorder, schizophrenia, and several previous suicide attempts.

124. Ms. Sullivan was housed at the OCJ for nearly a year prior to her death. Throughout her time at OCJ, she exhibited extremely serious symptoms, including multiple instances of self-harm, suicidal ideation, a refusal to eat or drink, rapid weight loss, and catatonia.

125. Approximately two months before Ms. Sullivan's death, numerous Turn Key providers, including nurses and two physicians, acknowledged Ms. Sullivan's emergent conditions and the fact that it was impossible for Ms. Sullivan to receive the life-saving care she needed in a jail setting.

126. In fact, one Turn Key physician noted, with respect to Ms. Sullivan:

> *DEPRESSED AFFECT, SEVERE ADULT FAILURE TO THRIVE. SEEMS AT HIGH RISK FOR POOR OUTCOME. I HAVE DISCUSSED HER CASE WITH PSYCHE, NURSING, AND WOUND CARE AND DO NOT SEE ANY LIKELY TO SUCCEED INTERVENTIONS IN THIS SETTING. SHE DOES NOT SEEM COMPETENT BY ANY BEHAVIORAL PARAMETER THAT I CAN SEE. WILL REDISCUSS OPTIONS WITH DR. CUKA AND DR. COOPER.*

127. Yet Turn Key providers allowed Ms. Sullivan to languish in her cell for months, cationic and barely eating, until her eventual death.

128.    After Ms. Sullivan's death, Kevin Wagner, a Captain at OCJ told an investigator, "[Ms. Sullivan] went from 148 when she got here to ... *she looks like a skeleton.*" Captain Wagner also told the investigator he helped get Ms. Sullivan to a local hospital for a week at one point "because I felt that *medical (in the Jail) wasn't providing her care enough.*"

129.    Another staff member told an investigator that Ms. Sullivan deteriorated *"to a bag of bones."*

130.    On June 12, 2021, Joseph Stewart was booked into the Cleveland County Jail.

131.    On June 13, 2021, Mr. Stewart advised a Jail detention officer and Turn Key Nurse Angela Albertson, LPN, that he needed to go to the hospital because his arm had been hurting since the day of his arrest and because he had an L1 (lumbar vertebrae) fracture that was hurting.

132.    Responsible Jail and Jail medical staff did nothing other than instruct Mr. Stewart to "not lay on his right side and rest arm."

133.    Two hours later, Mr. Stewart advised Turn Key Nurse Sarah Garcia, LVN, of his arm and back pain.

134.    In response, Mr. Stewart was moved to a bottom bunk. Nurse Garcia did not alert any other medical provider of Mr. Stewart's condition, complaints, or her decision making.

135.    On June 17, 2021, Nurse Albertson responded to a sick call placed by Mr. Stewart. Nurse Albertson noted that Mr. Stewart had increased pain and reduced range of motion in his left arm and a belief that it might be associated with his back.

136.    On June 19, 2021, Turn Key LPN Amanda Stehr observed Mr. Stewart "laying on the ...floor" in distress with a pain rating of 10/10. She charted that Mr. Stewart asked "multiple times" to be transported to the hospital, that he was experiencing the worst pain he had ever been in and he could not handle it."

137.    In response, Nurse Stehr called a Turn Key NP, *whose only action was to prescribe an 800 mg ibuprofen, despite Mr. Stewart's obviously serious – and steadily worsening – symptoms and*

*condition.*

138.   On June 21, 2021, Turn Key CRNP Becky Pata was informed that Mr. Stewart had fractured his L1 approximately three months previous, that he had experienced right shoulder pain since booking, and that he had a history of herniated discs.

139.   Pata observed Mr. Stewart limping and "obviously in a great deal of pain" before charting that she would "send to ER out of abundance of caution."

140.   After being transported to Norman Regional Hospital ("NRH"), Mr. Stewart's L1 compression fracture was confirmed.

141.   Mr. Stewart was returned to the Jail after his short visit to the NRH ER.

142.   On June 30, 2021, Mr. Stewart reported to Pata that he didn't feel well. He was taken back to NRH to be evaluated for pneumonia. Mr. Stewart reported symptoms including shortness of breath and unilateral leg swelling for the past month. After treating and discharging Mr. Stewart, NRH provided discharge instructions to the Jail and Turn Key that Mr. Stewart needed to return to the hospital in the event of "worsening symptoms or any symptoms of concern," "trouble breathing," or any "new symptoms or other concerns."

143.   On July 4, 2021, Mr. Stewart reported the following worsening or new conditions to Defendant Nurse Kariuki: 1) chest pain of 10/10; and 2) spitting up blood. Nurse Kariuki observed that Mr. Stewart appeared to be in distress with "reddish-green mucous...in the toilet."

144.   In response to these alarming (and new) symptoms, Kariuki did nothing other than click a preformatted box suggesting that she instructed him to "increase fluids, medication use, follow-up sick call if no improvement."

145.   Upon information and belief, Nurse Kariuki failed to report these symptoms to a physician, NP, PA, or RN, despite being aware of NRH's discharge instructions.

146.   On July 5, 2021, Mr. Stewart reported to Nurse Albertson additional worsening or new

conditions, including difficulty breathing and persistent coughing.

147.   In response to these new symptoms/worsening condition, Nurse Albertson did nothing other than instruct Mr. Stewart to "take good deep breaths so as not to get pneumonia."

148.   On July 7, 2021, Mr. Stewart reported to CRNP Pata that he now was coughing up blood streaked sputum and had heartburn.

149.   Pata, despite having knowledge of the NRH discharge instructions, did not contact a physician or the hospital and merely ordered omeprazole and prednisone for Mr. Stewart.

150.   On July 14, 2021, Mr. Stewart reported the following worsening or new conditions to Turn Key LPN Christina Meza: 1) "woke up with blood dripping down the side of my face"; 2) pale-looking appearance; 3) persistent coughing; and 4) "leaning forward to breathe with hands on knees."

151.   Meza did nothing other than order Guaifenesin, a generic cough medicine. She did not report Mr. Stewart's condition to a physician or the hospital despite knowing of NRH's discharge instructions.

152.   Within an hour of Mr. Stewart's complaint to Meza, Turn Key and Jail staff allowed Mr. Stewart's release without disclosing the extent of his medical condition. Mr. Stewart was released to the custody of a deputy from Kingfisher county at approximately 7:59 p.m.

153.   No one informed the Kingfisher deputy of Mr. Stewart's emergent condition or NRH's orders to bring Mr. Stewart back to the hospital if he had new or worsening symptoms.

154.   Upon arrival at the Kingfisher Jail, approximately 60 miles from Norman, the medical staff at the Kingfisher Jail refused to admit Mr. Stewart based on his dire medical condition.

155.   The transporting deputy then took Mr. Stewart to a local hospital before he was transferred to a hospital in Enid where he died the following day, July 15, 2021.

156.   Mr. Stewart died due to acute bacterial endocarditis, acute respiratory failure, congestive heart failure, and hyponatremia.

157.   On August 3, 2021, Gregory Neil Davis was arrested by Oklahoma City Police Department ("OCPD") Officers and transported to the OCJ.

158.   Mr. Davis was charged with indecent exposure, and was observed by officers to be in the midst of an obvious mental health crisis.

159.   Upon arriving at the OCJ, Mr. Davis was not evaluated by Turn Key personnel, nor was he tested for COVID-19 or have his vital signs taken.

160.   Mr. Davis was finally seen by a Turn Key provider, Sanaria Okongor, LPC, on August 6, 2021. Ms. Okongo noted that Mr. Davis suffered from signs of psychosis, but she made no treatment recommendations or took any actions other than to recommend follow-up a few days later.

161.   Ms. Okongor saw Mr. Davis again on August 9, 2021 and again noted he appeared to be suffering from psychosis. Ms. Okongor again failed to make any treatment recommendations or take any actions, including taking vital signs or referring Mr. Davis to a higher-level provider.

162.   For at least the final few days of Mr. Davis's life – from August 9-12, 2021 – inmates in nearby cells heard Mr. Davis beating at his cell door, crying, and begging for medical help but no one came to assist him, provide him medical care, or refer him to a physician or outside medical provider.

163.   On the morning of August 12, 2021, at approximately 6:45 a.m., Mr. Davis was observed in his cell in need of emergency medical attention by Lt. Morris and Ronald Anderson, employees and/or agents of the Oklahoma County Criminal Justice Authority ("OCCJA").

164.   Upon information and belief, EMSA was not called until approximately 9:17 a.m. When EMSA arrived, paramedics transported Mr. Davis to a nearby hospital, where he was pronounced dead.

165.   Mr. Davis died of a perforated duodenal ulcer, a condition that does not normally result in death unless left untreated for a substantial period of time, often more than 24 hours.

166.   From August 3-12, 2021, the only Turn Key personnel who saw, evaluated, assessed, or "treated" Mr. Davis was an LPC, who saw Mr. Davis on two occasions.

167.   Mr. Davis was never seen by a Turn Key physician nor was he referred to an outside medical provider other than the day of his death, when it was far too late.

168.   In August 2021, Larry Price, an intellectually disabled, 55-year-old inmate at the Sebastian County (Arkansas) Adult Detention Center, starved to death after responsible jail and Turn Key personnel failed to properly treat his medical and mental health conditions, including schizophrenia, for a year.

169.   The six foot, two inch Mr. Price entered the jail weighing approximately 185 pounds. By the time he was found unresponsive in his cell 366 days later, he weighed 90 pounds according to EMS reports. He had also been ingesting his own urine and feces according to reports.

170.    The medical examiner's report noted that Mr. Price was COVID-19 positive when he died, but the official cause of death was listed as "acute dehydration and malnutrition."

171.   For over a year, Turn Key personnel watched as Mr. Price deteriorated both physically and mentally, doing nothing to assess, evaluate, or treat his conditions. Nor did Turn Key personnel refer Mr. Price to an outside medical provider.

172.   On December 24, 2021, Dean Stith, a 55-year-old man, was booked into the Tulsa County Jail after being arrested for the non-violent misdemeanor of false reporting of a crime.

173.   Mr. Stith suffered from numerous pre-existing medical and mental health conditions, including hypertension, bipolar disorder and/or schizophrenia, and serious dementia, which was obvious even to a layperson. Indeed, upon information and belief, the charges Mr. Stith faced – false reporting of a crime – were the result of symptoms of his dementia.

174.   During the book-in process, on December 25, 2021 at approximately 12:14 a.m., Turn Key employee/agent James Flora, LPN filled out an Intake Screening form.  Pertinently, the Intake

Screening form indicates that Mr. Stith: was being treated for hypertension; had an unstable gait; had open sores and wounds on both of his hands; was disheveled, disorderly, and insensible.

175.    Mr. Stith's condition continued to deteriorate throughout his stay at the Jail.

176.    On January 7, 2022, Mr. Stith's blood pressure was measured at 101/68, his pulse was 60, which is in the low range. Inexplicably, his oxygen saturation was not taken.

177.    Also on January 7, Judy Wagga, a Turn Key Psychiatric Nurse Practitioner, saw Mr. Stith and noted that he "appeared to be responding to internal stimuli." This was a sign that Mr. Stith was suffering from acute psychosis, an emergent situation.

178.    On January 8, 2022, Mr. Stith's pulse rose to 98 and his blood pressure rose to 124/97. Yet, despite these fluctuations, Mr. Stith was not put on any blood pressure medicine or given additional treatment.

179.    On January 9, 2022, Alicia Irvin, Turn Key psychologist, noted Mr. Stith's dementia and wrote that he had slurred speech, a new alarming symptom, and was not responding appropriately to questions. Dr. Irvin described Mr. Stith as having a "Major Neurocognitive Disorder." But Mr. Stith was not sent to an outside medical provider nor referred to a physician.

180.    Mr. Stith's pulse had also plummeted to 56, which is considered bradycardia.  Bradycardia can be a serious problem if the heart can't pump enough oxygen-rich blood to the body. Symptoms of bradycardia include confusion, such as the confusion repeatedly displayed by Mr. Stith.

181.    By this point it was abundantly clear that Mr. Stith was suffering from a condition that could not be adequately treated in a correctional setting. With negligence and deliberate indifference, Dr. Irvin, who is not a physician, failed to call for an ambulance or otherwise ensure that Stith was urgently evaluated by a physician.

182.    At approximately 2:46 p.m. on January 9, Turn Key Nurse Sarah Lewis, LPN, observed Mr. Stith *"drooling, tangential thought, not responding appropriately to questions, diminished skin*

31

*turgor,*[5] *2+ pitting edema to BLEs, and full body weakness.*" Nurse Lewis also noted that Mr. Stith was *unable to urinate.*

183.   Particularly when coupled with his worsening condition over a period of days, Nurse Lewis' note clearly reflects that Mr. Stith was in a dire condition and in obvious need of emergent care that could not be provided in a correctional setting. Nonetheless, with negligence and deliberate indifference, Nurse Lewis failed to call for an ambulance or even contact a physician.

184.   On January 10, 2022, at approximately 4:05 a.m., Mr. Stith was found wedged between his bunk and the wall in his cell. TCSO Detention Officer Davis notified Turn Key Nurses Nikki Copeland and Sarah Schumacher, who found that Mr. Stith was "cool to the touch and arms contracted to chest."

185.   EMSA was called and paramedics arrived at approximately 4:39 a.m., finding Mr. Stith unresponsive. The EMSA paramedics documented that Jail *"health care staff are poor historians* and are unsure of timeline."

186.   The paramedics noted that Mr. Stith was displaying decorticate posturing, which is a pose in which someone has rigid, extended legs, arms bent toward the center of their body, pointed and turned in toes, curled wrists, and balled hands. Decorticate posturing is caused by abnormal brain conditions such as stroke, concussion, traumatic brain injury, brain bleed, brain tumor, or infection. Mr. Stith was transferred to St. John Medical Center where he presented in cardiac arrest.

187.   Providers at St. John were unable to resuscitate Mr. Stith, who passed away shortly after his arrival.

188.   The Office of the Chief Medical Examiner of Oklahoma determined that Mr. Stith died due to: 1) acute bronchopneumonia[6] due to complications of COVID-19; and 2) hypertensive

---

[5] A decrease in skin turgor is a late sign of dehydration.

[6] Symptoms of bronchopneumonia include muscle aches, confusion or delirium.

atherosclerotic cardiovascular disease.

189.   Mr. Stith's estate brough claims, pursuant to 42 U.S.C. § 1983, against Sheriff Regalado, Turn Key, and employees of Turn Key. *See Crawford v. Turn Key Health Clinics, LLC, et al.*, 24-CV-6-JDR-SH (N.D. Okla.). On July 8, 2025, this Court denied the *Crawford* defendants motions to dismiss. *See Crawford v. Turn Key Health Clinics, LLC, et al.*, 24-CV-6-JDR-SH (N.D. Okla. July. 8, 2025).

190.   In denying defendant Turn Key's motion to dismiss with respect to Ms. Crawford's municipal liability claim, the *Crawford* Court held and reasoned that 1) Ms. Crawford sufficiently alleged constitutional violations by Nurse Lewis and Nurse Higler, both of whom are Turn Key employees; 2) Turn Key has implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care to increase profits; and 3) these policies, procedures, customs, or practices caused Mr. Stith's injuries.

191.   In denying defendant Regalado's motion to dismiss with respect to Ms. Crawford's municipal liability claim, the *Crawford* Court held and reasoned that 1) Ms. Crawford identified several policies including keeping patients onsite for care, inadequate staffing, lack of access to a physician, and failure to train or supervise, that gave rise to the violation at issue in the case; 2) Ms. Crawford sufficiently alleged that a TCSO policy to keep inmates onsite for care may have been a moving force behind Mr. Stith's asserted constitutional violations; and 3) Ms. Crawford sufficiently alleged that inadequate staffing of medical personnel capable of treatment and failure to train or supervise personnel may have been a moving force behind Mr. Stith's asserted constitutional violation.

192.   On December 12, 2022, Shannon Hanchett died at the Cleveland County Jail.

193.   Ms. Hanchett was a mother of two boys and a pillar of the local community.  She was the owner of Norman's Cookie Cottage, a well-known and popular bakery in Norman, OK.

194.   Ms. Hanchett had a bachelor's degree and a master's degree in Human Relations from the University of Oklahoma.  She began her career helping children at the Oklahoma Department of Mental Health Services, where she worked for almost a decade advocating for mental health care. Tragically, she would later find herself in the same position as the vulnerable people she had passionately tried to help.

195.   In October of 2022, Ms. Hanchett went to the hospital for severe headaches, but a CT scan found no abnormalities.  A few weeks later, she began to exhibit signs of mental illness consistent with bipolar disorder and/or schizophrenia. She had no prior history of illness

196.   The following month, Ms. Hanchett began to hallucinate and became convinced that her husband of 17 years, Daniel, had tapped the cell phone he had recently bought for her.

197.   On the evening of November 26, 2022, Ms. Hanchett entered an AT&T Wireless store in Norman, hoping to buy a new cell phone.  While in the store, she exhibited obvious signs of psychosis.

198.   Clearly confused, distressed, and suffering from delusions, Ms. Hanchett asked a store employee to call 911, and a Norman Police Department ("NPD") Officer responded to the scene.

199.   The Officer acknowledged that Ms. Hanchett appeared to be exhibiting behavior consistent with a mental health disorder. Nevertheless, he arrested Ms. Hanchett for misdemeanor obstruction and transported her to the Cleveland County Jail ("Jail"). Video from the officer's body-worn camera shows that Ms. Hanchett is disoriented and terrified at the prospect of being arrested.

200.   Ms. Hanchett had no criminal history. This was her first time in a detention facility. She was a pretrial detainee.

201.   Jail surveillance video shows Ms. Hanchett's mental health status, which could conservatively be described as acute psychosis, continued to deteriorate after arriving at the Jail.

202.   Turn Key nurse Danille Hay, LPN, began the medical intake process with Ms. Hanchett

but later claimed she was unable to complete it due to Ms. Hanchett's ongoing and severe mental health crisis.

203.    Nurse Hay *was* able to chart, however, that Ms. Hanchett suffered from lupus and bipolar disorder.

204.    Nurse Hay also took Ms. Hanchett's vital signs. Her blood pressure (143/89) and pulse (120 BPM) were both elevated. Nurse Hay did not, however, take any steps to address these concerning vital signs.

205.    Nurse Hay later charted that Ms. Hanchett had been "uncooperative" during processing and that she'd been unable "to complete [intake] at this time." However, in a written report, Officer David Owen notes that Ms. Hanchett "appears to cooperate with officers while being processed as a new inmate."

206.    After failing to complete the intake process, Jail staff locked Ms. Hanchett in processing cell B130 – a tiny, cockroach-infested cell that had no sink, no toilet and no bed. For the next 11 days, she was confined in these conditions and deprived of virtually all human contact. The lights were left on at all times, day and night, depriving her of any sleep.

207.    For periods of up to 5 days at a time, no one at the Jail even opened the door of Ms. Hanchett's cell. Denied access to a toilet, she was forced to urinate on the floor and then lie in her own waste.

208.    Despite the absence of a sink in her cell, no one at the Jail provided her with water or other hydration, day after day after day.

209.    Throughout this time, the Jail and Turn Key staff were fully aware of Ms. Hanchett's dreadful conditions of confinement and her escalating mental health crisis.

210.    Ms. Hanchett's cell was video monitored, allowing Jail staff to clearly see her extreme distress, her erratic behavior, and the rotting food, trash, and human waste on the floor of her cell.

Despite observing that Ms. Hanchett had not been adequately eating and had been given nothing to drink for days, they failed to address these dangerous health risks or report them to a physician. This constitutes deliberate indifference, reckless neglect and inhumane mistreatment across the board. Indeed, Ms. Hanchett was shown *nothing but* indifference during her time at the Cleveland County Jail.

211.    After 12 unspeakably horrific days at the Cleveland County Jail, Ms. Hanchett died. The Medical Examiner's office determined Ms. Hanchett died of heart failure. Other significant conditions contributing to her death were psychosis with auditory and visual hallucinations and severe dehydration. On information and belief, Ms. Hanchett's death would not have occurred in the absence of her prolonged catatonia and severe dehydration. Ms. Hanchett was just 38 years old when she died.

212.    On July 22, 2022, William Wimbley, a 64-year-old man, was booked into the McCurtain County Jail another facility that relied on Turn Key to provide medical services to its inmates.

213.    Mr. Wimbley informed Turn Key staff he suffered from multiple pre-existing cardiovascular problems including chronic hypertension and was prescribed several medications to treat these pre-existing conditions.

214.    For months, Mr. Wimbley complained that the McCurtain County Jail and Turn Key Staff were not properly controlling his blood pressure, but his pleas were ignored.

215.    On January 7, 2023, Mr. Wimbley experienced severe chest pains and was taken to a hospital where his blood pressure was measured at 226/124, which is an extreme and potentially deadly state of hypertension.

216.    Mr. Wimbley was stabilized and then returned to the McCurtain County Jail with discharge instructions that the jail adjust his medications to better control his hypertension and further instructions that Mr. Wimbley should follow up with a physician within 1-2 days and if his symptoms

worsened, he should return to the ER.

217.    Two days later January 9, 2023, at the McCurtain County Jail, Mr. Wimbley again experienced chest pain and was in another hypertensive crisis with his blood pressure measured at 186/121. Jailer Brittany Stockton called Turn Key APRN Becky Pata to inform her of Mr. Wimbley's condition.

218.    Contrary to the discharge instructions from the hospital, Mr. Wimbley was not taken back to the hospital or seen by a physician. Instead, Nurse Pata instructed jail staff to give .2mg of Clonidine and to do nothing further.

219.    For weeks, Mr.  Wimbley's blood pressure was measured at levels consistent with a hypertensive crisis, but no steps were taken by the jail or Turn Key staff have Mr. Wimbley see a physician, return him to a hospital, or modify his treatment. Mr. Wimbley continued to experience chest pains and dangerous hypertension due to the jail and Turn Key's inaction.

220.    In early March 2023, Mr. Wimbley reported to both jail and Turn Key staff that he developed weakness and numbness in his left side, fatigue and additional pain.

221.    Throughout March 2023, Mr. Wimbley's health continued to deteriorate, and he pled to jail and Turn Key staff daily to be taken to the hospital but again and again his pleas for help were ignored.

222.    At the end of March/beginning of April 2023, Mr. Wimbley's condition severely worsened. He reported to jail and Turn Key staff that his left side weakness and numbness had gotten even worse, to the point that he struggled to walk. This too was ignored by jail and Turn Key staff.

223.    On April 5, 2023, Mr. Wimbley's condition deteriorated to the point that he lost control of his bowels and bladder and after months of indifference to Mr. Wimbley's suffering the jail and Turn Key staff finally sent Mr. Wimbley to a local hospital where it was determined he had suffered a stroke. Eventually, Mr. Wimbley had to be life-flighted to OU Medical Center for additional

treatment.

224.    In late April 2023, Mr. Wimbley was transferred to a rehabilitation hospital for several grueling weeks of physical therapy in an effort to restore strength and mobility to his left side.

225.    On February 19, 2022, China Bradley was booked into the Tulsa County Jail.

226.    Ms. Bradley was 24 years old and suffered from paranoid schizophrenia, bipolar disorder, anxiety, and dissociative identity disorder. Turn Key obtained her mental health records and prescription information.

227.    Three days after Ms. Bradley was booked into jail Turn Key started giving her Paroxetine and Aripiprazole, the mental health medications she was prescribed.

228.    Ms. Bradley was evaluated by multiple Turn Key employees who noted Ms. Bradley was suffering from many mental health related symptoms including delusions, hearing "voices," speaking to people/entities that were not there, and believing she was a male that was related to China Bradley.

229.    On March 22, 2022, Ms. Bradley was taken off Paroxetine and Aripiprazole and started on Risperidone, another drug that treats bipolar disorder and schizophrenia.

230.    By July 22, 2022, Ms. Bradley's already clearly poor mental state further deteriorated. She remained in her bed for most of every day and night, rarely went out for recreation time, and kept her cell in an unsanitary condition, with food, trash, and papers strewn around her cell.

231.    On July 26, 2022, Ms. Bradley began taking an additional mental health medication, Lexapro.

232.    Ms. Bradley's condition continued to decline. On October 26, 2022, she was put on suicide watch. Ms. Bradley presented with delusions and flight of ideas which are symptoms associated with manic episodes and psychotic states.

233.    On December 7, 2022, Turn Key provider Judy Wagga observed Ms. Bradley trembling and Ms. Bradley was started on Benztropine Mesylate, a medication used to treat Parkinson's

Disease.

234.    On or about December 16, 2022, Ms. Bradley reported that she felt sick and was throwing up. Additionally, a Turn Key licensed professional counselor noticed Ms. Bradley moved her mattress to the floor of her cell.

235.    Over the next couple of days Ms. Bradley experienced symptoms of a serious medical condition including feeling faint/fatigued and her vision would randomly become blurry.

236.    Ms. Bradley also stopped eating regularly and spent almost every minute of the day lying naked on the floor of her cell, rarely responding to anyone instead responding primarily to internal stimuli.

237.    On December 21, 2022, Ms. Bradley, still experiencing these symptoms, fell in the showed and developed a golf ball-sized "goose egg" on her forehead. She was not sent to the hospital or seen by a physician. Ms. Bradley's psychotic symptoms worsened, and she refused or was unable to engage with mental health professionals. From then on Ms. Bradley experienced great difficulty walking or standing by herself without falling.

238.    On December 23, 2022, Ms. Bradley, likely after another fall, was found lying on the floor of her cell unresponsive with no pupil response and bleeding from her left eye. Two hours after being found she was transported to the emergency room.

239.    At the emergency room, blood tests showed Ms. Bradley was suffering from a buildup of lactic acid in her blood and severe potassium deficiency which can cause severe muscle weakness, low blood pressure, lightheadedness or faintness, abnormal heart rhythms, or even respiratory failure.

240.    Ms. Bradley was treated with IV fluids and discharged from the hospital the next day. Upon discharge her discharge, emergency room providers warned that if Ms. Bradley experienced new or worsening symptoms, she should return to the ER immediately for further care.

241.    After Ms. Bradley returned to the jail where Turn Key APRN Judy Wagga, who was not onsite, ordered injections of Haldol and Benadryl which slowed Ms. Bradley's breathing. Both medications were inappropriate and unnecessary. Haldol was especially dangerous because it is contraindicated for those at risk for certain heart problems, including people with low potassium like Ms. Bradley.

242.    Throughout December 24 and 25, 2022, multiple Turn Key providers saw Ms. Bradley lying naked on the floor of her cell, unable to stand or walk, unresponsive to verbal stimuli and with deliberate indifference to her serious medical needs left her.

243.    At approximately 5:00 p.m. on December 25, 2022, Turn Key nurse Lyric Brooks, LPN encountered Ms. Bradley during pill pass. Nurse Brooks observed Ms. Bradley in the same emergent state she'd been in for the previous several hours and days: lying naked on the floor of her cell not responsive to verbal stimuli. By this point, Ms. Bradley had been lying naked on the floor of her cell, catatonic, for the approximately 28 hours, ignored by the few members of the Jail and Jail medical personnel who were staffed on Christmas, despite her obviously emergent medical and mental health conditions.

244.    Nurse Brooks called a Turn Key Charge Nurse to notify them about Ms. Bradley's obviously emergent condition. The Charge Nurse responded that Ms. Bradley's condition was normal and she'd been in that same state since she returned from St. John.

245.    Both Nurse Brooks and a TCSO deputy told the Charge Nurse that Ms. Bradley's condition was *not* normal based on their knowledge of Ms. Bradley's typical state and demeanor from previous interactions with her at the Jail.

246.    Upon information and belief, the Charge Nurse reluctantly came to Ms. Bradley's cell to "assess" her and brushed off Nurse Brooks' and the deputy's concern, callously stating that Ms. Bradley was fine.

247.   Still alarmed at Ms. Bradley's obviously dire condition, Nurse Brooks tried to get in contact with someone in the Mental Health department at the Jail, but no one answered due to the understaffing on Christmas.

248.   At 7:30 p.m. on December 25, 2022, Ms. Bradley was unresponsive to even a sternal rub. A nurse was called to her cell where it was observed that Ms. Bradley's respirations were shallow and she was clearly near death.

249.   An ambulance was called to take Ms. Bradley to the hospital where she was later pronounced dead at the age of 25.

250.   In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates.  And each of these inmates, with obvious, serious and emergent medical and mental health conditions, was kept at the jail when they clearly should have been transported to a hospital or other off-site provider capable of assessing and treating the conditions.

251.   By its design, the Turn Key medical system was destined to fail.

252.   At all pertinent times, Dr. William Cooper, D.O., was the "Medical Director" for Turn Key.  In an effort to cut costs, Turn Key and Dr. Cooper spread the few physicians and mid-level providers they employ far too thin, making it impossible for them to medically supervise, let alone provide appropriate on-site medical care, at any of the county jails under contract with Turn Key.

253.   In essence, Turn Key employs a small number of mid-level providers, such as physician's assistants or nurse practitioners, and physicians who travel all over the State (and sometimes to other states, such as Arkansas and Kansas) to each of jails for short blocks of time.  This constitutes plainly insufficient medical staffing, particularly for a large institution like the Tulsa County Jail.

254.   With no physician reasonably available to medically supervise the care provided to the inmates, undertrained personnel were left to practice outside the scope of their training.

255.   In other words, Turn Key had a policy, practice or custom of inadequately staffing county

jails, including the Tulsa County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor or treat inmates, like Ms. Holmes, with complex and serious medical needs, including relating to chronic asthma with severe acute attacks

256.    With wholly inadequate physician oversight of the clinical care, the non-physician staff was improperly, and dangerously, expected to act in the role of a physician, with the understanding that off-site care was to be avoided.

257.    This system, designed to minimize costs at the expense of inmate care, obviously placed inmates with complex, serious and life-threatening medical and mental health conditions, like Ms. Holmes, at substantial risk of harm.

258.    This system, which Turn Key implemented company-wide, was substantially certain to, and did, result in constitutional deprivations.

259.    TCSO and the County were on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed inmates like Ms. Holmes at excessive risk of harm.  However, TCSO and the County failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Ms. Holmes.

260.    Moreover, Dr. Cooper, Turn Key's Medical Director, has maintained a policy, at the corporate level, of intentionally omitting information about inmates' negative health outcomes from written documentation, and has ordered Turn Key personnel to keep such bad news out of written communications.

261.    This policy, in and of itself, constitutes deliberate indifference to the health and safety of Turn Key's patients.

262.    By simply retaining Turn Key as the medical provider at the Jail in light of the obviously substandard care that Turn Key has provided – and continues to provide – to inmates at the Tulsa County Jail and county jails all over Oklahoma, Arkansas, Texas, Colorado, and Kansas, TCSO/the

County are deliberately indifferent to inmates' serious medical needs.

263.    TCSO/the County are aware, or should be aware, of Turn Key's repeated failures to provide constitutionally adequate medical care for inmates, yet TCSO/the County have made the conscious decision to retain Turn Key as the Tulsa County Jail's medical provider.

264.    Moreover, Dr. Cooper, Turn Key's Medical Director, has maintained a policy, at the corporate level, of intentionally omitting information about inmates' negative health outcomes from written documentation, and has ordered Turn Key personnel to keep such bad news out of written communications.

265.    This policy, in and of itself, constitutes deliberate indifference to the health and safety of Turn Key's patients.

266.    Turn Key has maintained a custom of inadequate medical care and staffing at a corporate level which poses excessive risks to the health and safety of inmates like Ms. Holmes.

267.    There is an affirmative link between the aforementioned unconstitutional acts and/or omissions Turn Key staff, including Nurse Lemons, Nurse Vonholt, Nurse Whisenhunt, Nurse Skousen, and Nurse Rasor, and policies, practices and/or customs which Turn Key promulgated, created, implemented and/or possessed responsibility for.

268.    Detention and medical staff were repeatedly informed by Ms. Holmes about her serious asthma and observed the worsening symptoms related to her asthma. Ms. Holmes's pleas for her inhaler were disregarded.  In deliberate indifference to these serious medical needs, neither Nurse Lemons, Nurse Vonholt, Nurse Whisenhunt, Nurse Skousen, and Nurse Rasor, nor any other Turn Key or TCSO employee/agent adequately treated Ms. Holmes's symptoms and conditions. Even after Ms. Holmes's repeated requests for medical assistance she was not given her inhaler and struggled to breathe. Eventually, she was found not breathing in her cell. This was callous and reckless indifference.

43

269.    It was obvious that Ms. Holmes's asthma required consistent medications and emergency intervention.  Yet, despite the obvious and excessive risks to her health and safety, Nurse Lemons, Nurse Vonholt, Nurse Whisenhunt, Nurse Skousen, and Nurse Rasor, and the other Turn Key employees/agents referenced above, ignored Ms. Holmes, ignored Ms. Holmes's medical providers, and ignored basic medical practices and standards.

270.    Even if no single Turn Key or TCSO employee/agent had violated Ms. Holmes's constitutional rights, Turn Key and the Sheriff would still be liable under a theory of a systemic failure of its policies and procedures as described herein.  There were such gross deficiencies in the medical delivery system at the Jail that Ms. Holmes was effectively denied constitutional medical care.

271.    In addition, TCSO has utterly failed to train its detention staff in how to properly care for or supervise inmates, like Ms. Holmes, with complex or serious medical needs, with deliberate indifference to the health and safety of those inmates.

272.    TCSO's failure to train and supervise Jail staff was admitted in 2018 by the TCSO Jail Administrator, who sent an email to Jail supervisors concerning Jail staff's many failures, in which he concluded: "What I see now is either people don't have the abilities to complete or excel in their positions which means we as a whole have failed. We either didn't train them, we didn't challenge them, we didn't hold them accountable (which doesn't always mean discipline)...."

## CAUSES OF ACTION

### VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
### (42 U.S.C. § 1983)

273.    Paragraphs 1-272 are incorporated herein by reference.

**A.    Underlying Violations of Constitutional Rights/Individual Liability**

274.    The Turn Key/TCSO staff, including Nurse Lemons, Nurse Vonholt, and Nurse

Whisenhunt, as described above, knew or it was obvious that Ms. Holmes' health and safety was at substantial risk.

275.   As described *supra,* Ms. Holmes had serious and emergent and ongoing medical issues that were known and obvious to the Turn Key/TCSO employees/agents. It was obvious that Ms. Holmes needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed and obstructed. Turn Key/TCSO employees/agents, including Nurse Lemons, Nurse Vonholt, and Nurse Whisenhunt, disregarded the known, obvious and substantial risks to Ms. Holmes's health and safety.

276.   As a direct and proximate result of this deliberate indifference, as described above, Ms. Holmes experienced unnecessary physical pain, a worsening of her conditions, severe emotional distress, mental anguish, a loss of quality and enjoyment of life, terror and death.

277.   As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to compensatory damages.

**B.   Municipal/"Monell" Liability (Against Turn Key)[7]**

278.   Paragraphs 1-277 are incorporated herein by reference.

279.   Turn Key is a "person" for purposes of 42 U.S.C. § 1983.[8]

280.   At all times pertinent hereto, Turn Key was acting under color of State law.

---

[7]      "A municipal entity may be liable where its policy is the moving force behind the denial of a constitutional right, *see Monell* [*v. New York City Dept. of Social Servs.,* 436 U.S. 658, 694 (1977), 98 S.Ct. 2018], *or* for an action by an authority with final policy making authority, *see Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 482–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)." *Revilla v. Glanz,* 8 F. Supp. 3d 1336, 1339 (N.D. Okla. 2014) (emphasis added). Plaintiff's municipal liability claim in this action is based upon a *Monell* theory of liability*,* thus he need not establish that Turn Key had final policymaking authority for Tulsa County.

[8]      "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, case law from [the Tenth Circuit] and other circuits *has extended the Monell doctrine to private § 1983 defendants." Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1216 (10ᵗʰ Cir. 2003) (citations omitted) (emphasis added). *See also Smedley v. Corr. Corp. of Am.,* 175 F. App'x 943, 946 (10th Cir. 2005).

281.    Turn Key has been endowed by Tulsa County with powers or functions governmental in nature, such that Turn Key became an instrumentality of the State and subject to its constitutional limitations.

282.    Turn Key is charged with implementing and assisting in developing the policies of TCSO with respect to the medical and mental health care of inmates at the Tulsa County Jail and has shared responsibility to adequately train and supervise its employees.

283.    In addition, Turn Key implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Jail.

284.    There is an affirmative causal link between the aforementioned acts and/or omissions of Turn Key medical staff, as described above, in being deliberately indifferent to Ms. Holmes's serious medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by Turn Key.

285.    To the extent that no single officer or professional violated Ms. Holmes's constitutional rights, Turn Key is still liable under a theory of a systemic failure of  policies and procedures as described herein. There were such gross deficiencies in medical procedures, staffing and facilities and procedures that Ms. Holmes was effectively denied constitutional conditions of confinement.

286.    Turn Key knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Ms. Holmes.   Nevertheless, Turn Key failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Ms. Holmes's, serious medical needs.

287.    Turn Key tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

288.   Additionally, Turn Key has maintained a healthcare delivery system at a corporate level, including at the Tulsa County Jail, that has "such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir. 1985).

289.   There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Plaintiff's injuries and damages as alleged herein.

### C.   Official Capacity Liability (Against Sheriff Regalado)

290.   Paragraphs 1-289 are incorporated herein by reference.

291.   The aforementioned acts and/or omissions of TCSO and/or Turn Key staff in being deliberately indifferent to Ms. Holmes's health and safety and violating Ms. Holmes's civil rights are causally connected with customs, practices, and policies which the County/TCSO promulgated, created, implemented and/or possessed responsibility for.

292.   Such policies, customs and/or practices are specifically set forth, *supra.*

293.   The County/TCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Ms. Holmes's, health and safety.

294.   The County/TCSO has maintained a healthcare delivery system at the Jail that has such "gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir. 1985).

295.   As a direct and proximate result of the aforementioned customs, policies, and/or practices, Ms. Holmes suffered injuries and damages as alleged herein.

296.    As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages.

**WHERFORE,** based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages, and punitive damages, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

SMOLEN & ROYTMAN

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
701 S. Cincinnati Avenue
Muskogee, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F

*Attorneys for Plaintiff*